1
2
3
4
5
6
7

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        bscott@bursor.com
        jwilner@bursor.com

8      *Attorneys for Plaintiffs*

9      *[Additional Counsel Listed on Signature Page]*

10

11                    **UNITED STATES DISTRICT COURT**

12                   **SOUTHERN DISTRICT OF CALIFORNIA**

13

14   | JOHN DOE 1, JOHN DOE 2, and | Case No. 23-cv-2215-AGS-DEB |
15   CATHERINE GOREY, on behalf of
themselves and all others similarly
16   situated,                                    **FIRST AMENDED**
                                                  **CONSOLIDATED CLASS**
17                              Plaintiffs,        **ACTION COMPLAINT**

18        vs.
                                                  **JURY TRIAL DEMANDED**
19   SCRIPPS HEALTH,

20                              Defendant.

21

22

23

24

25

26

27

28

---

1.      Plaintiffs JOHN DOE 1, JOHN DOE 2[1], and CATHERINE GOREY ("PLAINTIFFS"), at all relevant times herein, have been patients of Scripps Health ("SCRIPPS" or "DEFENDANT") and bring this class action against Defendant in their individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, their counsel's investigation, and upon information and belief as to all other matters, as follows:

2.      Plaintiffs bring this case to address Defendant's unlawful practice of disclosing Plaintiffs' and Class Members' confidential, personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") to third parties, including Meta Platforms, Inc., d/b/a Meta ("Facebook") and Google LLC ("Google"), without consent, through the use of tracking software that is embedded in Defendant's website.

3.      Defendant owns and controls scripps.org ("Defendant's Website" or the "Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, and more.

4.      Unbeknownst to its patients, Defendant installed tracking technologies ("Tracking Tools") onto its Website. These Tracking Tools, such as pixels, web beacons, or cookies, track and collect communications with Defendant via the Website and surreptitiously force the user's web browser to send those communications to undisclosed third parties, such as Facebook or Google.

5.      Plaintiffs and Class Members used the Website to submit information related to their past, present, or future health conditions, including, for example, searching for particular medical specialists, such as neurologists, and searching for the specific services offered by particular medical specialists and physicians. Such Private

---

[1] Plaintiffs John Doe 1 and John Doe 2 bring this action anonymously out of a desire to protect their PHI under the Health Insurance Portability and Accountability Act of 1996 and California Law.

FIRST AMENDED CONSOLIDATED COMPLAINT           CASE NO. 23-CV-2215-AGS-DEB

Information allows the third party (*e.g.*, Facebook or Google) to know that a specific patient was seeking confidential medical care from Defendant, as well as the type of medical care, type of physician or specialist, and types of services being sought. This disclosure also allows a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, or neurological diseases.

6.   Tracking Tools, such as the ones Defendant incorporated into its Website, are created by third-party companies, data brokers, and online advertisers.

7.   Defendant implemented and embedded Facebook's tracking pixel ("Pixel") on its Website. The Pixel is a snippet of code implemented and embedded on a website for the purpose of tracking every action a user takes, including but not limited to, which buttons they click, the exact search terms or phrases they type into text bars, and any other information that a user communicates through a website. The Pixel shares all a website visitors' communications and information with its creator, Facebook.

8.   The Pixel is customizable and programmable, meaning that the website owner controls which of its webpages contain the Pixel, which events are tracked and transmitted to Facebook and what information from the communications are disclosed.

9.   Facebook connects user data from Defendant's Website to the individual's Facebook ID ("FID"). The FID links the user to his/her Facebook profile, which contains detailed information about the profile owner's identity.

10.   Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule,

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

11.     In addition, as explained further below, HHS has specifically warned healthcare-regulated entities that Tracking Tools, like those used by Defendant on its Website, transmit personally identifying information to third parties and that such information should not be transmitted without a HIPAA-acceptable written authorization from patients.

12.     The Federal Trade Commission ("FTC") has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

13.     In addition, California's Confidentiality of Medical Information Act ("CMIA") prohibits healthcare providers from disclosing medical information regarding its patients without first obtaining their authorization.

14.     Despite these warnings, Defendant embedded hidden Tracking Tools on its Website, essentially planting a bug on patients' web browsers that forced them to disclose private and confidential communications to third parties. Defendant did not disclose the presence of these Tracking Tools to its patients and Website users.

15.     Healthcare patients do not anticipate or expect that their trusted healthcare provider will send personally identifying health information or confidential medical information collected via its webpages to a hidden third party – let alone companies like Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue – without the patients' consent. Neither Plaintiffs nor any other Class Members signed a written authorization permitting Defendant to send their Private Information to Facebook.

16.     Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by knowingly installing the Pixel on its Website and aiding and abetting Facebook's interception of communications sent and received by

3

Plaintiffs and Class Members, including communications containing protected medical information.

17.    As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of their Private Information; and (iv) the continued and ongoing risk to their Private Information.

18.    Plaintiffs seek to remedy these harms and bring claims for: (1) violation of the California Invasion of Privacy Act ("CIPA"); (2) violation of the California Confidentiality of Medical Information Act ("CMIA"); (3) invasion of privacy under the California Constitution; (4) common law invasion of privacy—intrusion upon seclusion; (5) breach of implied contract; (6) violations of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2511(1), *et seq*.; and (7) violation of Title II of the ECPA, 18 U.S.C. § 2702, *et seq*.

## PARTIES

19.    Plaintiff John Doe 1 is a natural person and citizen of California, residing in Cathedral City, California (Riverside County), where he intends to remain.

20.    Plaintiff John Doe 2 is a natural person and citizen of California, residing in San Diego, California (San Diego County), where he intends to remain.

21.    Plaintiff Catherine Gorey is a natural person and citizen of California, residing in San Diego, California (San Diego County), where she intends to remain.

22.    Defendant Scripps Health is a non-profit healthcare entity operating throughout the San Diego area and with its principal place of business in San Diego. Defendant provides comprehensive health care to California citizens through five hospital campuses, thirty clinics, and more than 3,000 San Diego doctors.[2] Defendant is a covered entity under HIPAA (42 U.S.C. § 1320d and 45 C.F.R. Part 160-164). Defendant owns and operates www.scripps.org.

---

[2] *Looking for a Doctor?*, Scripps Health, https://www.scripps.org/physicians/find.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

**JURISDICTION & VENUE**

23.     This Court has jurisdiction under 28 U.S.C. § 1331. The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims were so related to the federal claims brought by Plaintiffs at the time the matter was originally brought that they form part of the same case or controversy, and the Court may continue to exercise jurisdiction even if no federal claim remains.

24.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant is headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**FACTUAL ALLEGATIONS**

**A.     The U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers**

25.     Considering Tracking Tools like the Pixel, HHS issued a bulletin instructing regulated entities like Defendant to only use such software in an extremely limited function:

> **Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures of [electronic protected health information] to tracking technology vendors or any other violations of the HIPAA Rules.[3]

---

[3] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* U.S. Dep't of Health and Hum. Servs. (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

In other words, HHS has expressly stated that entities like Defendant that implement the Facebook Pixel have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

26.  The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*** [4]

27.  Additionally, HHS has warned healthcare providers that Protected Information is not limited exclusively to patient portals like MyChart, and that providers like Defendant still have an obligation to protect information on non-password protected pages or unauthenticated pages:

> Tracking technologies on a regulated entity's unauthenticated webpage that **addresses specific symptoms or health conditions**, such as pregnancy or miscarriage, or that permits individuals to **search for doctors or schedule appointments** without entering credentials may have access to PHI in certain circumstances. For example, **tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider.** In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[5]

28.  Moreover, HHS and the FTC have recently issued a warning letter directly to Defendant informing it that its use of online Tracking Tools presents serious privacy and security risks, and that Defendant is impermissibly disclosing consumers' sensitive personal health information to third parties. Specifically, the letter provides:

> The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are

---

[4] *Id.*
[5] *Id*. (emphasis added).

FIRST AMENDED CONSOLIDATED COMPLAINT      CASE NO. 23-CV-2215-AGS-DEB

writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[] news reports,[] FTC enforcement actions,[] and an OCR bulletin [] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users.

Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.

## Health Insurance Portability and Accountability Act of 1996 (HIPAA)

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium.

The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI…

## FTC Act and FTC Health Breach Notification Rule

Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information

7

under the FTC Act and the FTC Health Breach Notification Rule. . . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[6]

### B.   Underlying Web Technology

29.    To understand Defendant's unlawful data-sharing practices, it is important to first understand basic web design and Tracking Tools.

30.    Devices (such as computer, tablet, or smart phone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

31.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

32.    Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.
- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.
- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers.

---

[6] Attached hereto as **Exhibit A** is a true and correct copy of the July 20, 2023 letter to Defendant from the HHS regarding Defendant's unlawful "Use of Online Tracking Technologies."

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[7]

33.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source Code is essentially the back of the website, and the user does not see what happens in the source code.

34.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Pixels are embedded in the Source Code and instruct the Website to send a second set of transmissions to third parties' servers, *e.g.,* the servers of Facebook and Google.

35.     By contrast, the Markup is the façade of the Website and what the user sees.

36.     As an example, a patient's HTTP Request seeks specific information from Defendant's Website (*e.g.*, "Find a Doctor" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

37.     Thus, when a patient visits scripps.org and selects the "Find a Doctor" button, the patient's browser automatically sends an HTTP Request to Defendant's

---

[7] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that webpage. As depicted below, the user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.



*Figure 1. The image above is a screenshot taken from Markup GitHub[8] evidence for its article detailing Defendant's and other hospitals' data practices (screenshot from 4/27/2022).*

38.    Above is the Markup of Defendant's Webpage. Behind the scenes and in the backdoor of the webpage, Tracking Tools like the Facebook Pixel were embedded in the Source Code, automatically transmitting what the patient did on the webpage and effectively opening a hidden spying window into the patient's browser.[9]

---

[8] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, and Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[9] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. The Facebook Pixel is a tiny image file that is so small

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

39.     Defendant's Source Code manipulated the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook. These transmissions occurred contemporaneously, invisibly, and without the patient's knowledge.

40.     Thus, without its patients' consent, Defendant effectively used its Source Code to commandeer and "bug" or "tap" its patients' computing devices, allowing Facebook and other third parties to listen in on all their communications with Defendant and thereby intercept those communications, including Private Information, including, but not limited to, their status as patients, searches for physicians, treatments, treatment locations, conditions, and appointment information.

**C.     Tracking Tools**

41.     Third parties, like Facebook and Google, offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

42.     In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, and button clicks. Webpages that use Tracking Tools, such as Defendant's, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website.

43.     When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Facebook Pixel on Defendant's Website caused the user's web browser to instantaneously duplicate the contents of

---

as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

the communication with the Website and send the duplicate from the user's browser directly to Facebook's server.

44.     Notably, transmissions only occur on webpages that contain Tracking Tools.[10] Thus, Plaintiffs' and Class Member's Private Information would not have been disclosed to Facebook or Google via this technology but for Defendant's decisions to install the Tracking Tools on its Website.

45.     To ensure that data can be collected from even a particularly tech-savvy user's attempt to circumvent browser-based wiretap technology, a website operator can also transmit data directly to Facebook using first-party cookies (CAPI server-to-server transmission). Users cannot detect or prevent transmissions through first-party cookies.

46.     CAPI is another Facebook tool that functions as a redundant measure to circumvent any ad blockers or other denials of consent by the website user by transmitting information directly from Defendant's servers to Facebook's servers.[11, 12] Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[13]

47.     The third parties to whom a website transmits data through Tracking Tools and associated workarounds (CAPI) do not provide any substantive Website content relating to the user's communications. Instead, these third parties are typically

---

[10] Defendant's Facebook Pixel has its own unique identifier (represented as id=737223089739564), which can be used to identify which of Defendant's webpages contain the Facebook Pixel.

[11] *What is the Facebook Conversions API and how to use it*, Realbot (last updated May 20, 2022), https://revealbot.com/blog/facebook-conversions-api/.

[12] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api.

[13] *About Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/2041148702652965?id=81885903231765.

procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

48.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

**D.     Defendant Disclosed Plaintiffs' and Class Members' Private Information to Facebook Using Tracking Technologies in Violation of its Privacy Policy**

49.     Defendant's *Privacy Policy* provides that: "By using this site, you agree that Scripps may monitor your use of this website and may use the results of such monitoring without limitation… Personally identifiable information may be collected from visitors to our site and provided in an aggregate form to other parties within the Scripps family for marketing, advertising, or other similar uses."[14]

50.     However, at no point did Defendant's *Privacy Policy* provide that Plaintiffs' and Class Members' sensitive medical information and personally identifiable information may be shared with any third-party sites outside of the "Scripps family," such as Facebook or Google.[15] Indeed, Defendant's *Privacy Policy* clearly does not include Facebook or Google as part of its "Scripps family."

51.     Defendant intentionally installed Tracking Tools to secretly track patients by disclosing their communications in violation of its own *Privacy Policy*, common law, contractual, statutory, and regulatory duties and obligations.

---

[14] Scripps Health has since updated its *Privacy Policy* and allegedly it has removed tracking technology; however, the previous *Privacy Policy* was recovered using the Wayback Machine, a webtool that catalogues captured pages. The *Privacy Policy* referenced was captured on Defendant's page on June 19, 2022. https://web.archive.org/web/20220619002542/https://www.scripps.org/privacy-policy.
[15] *Id*.

---

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

52.     Defendant's Facebook Pixel had its own unique identifier (represented as id=737223089739564), which was used to identify which of Defendant's webpages contained the Facebook Pixel.

53.     The Facebook Pixel allowed Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website did not rely on the Pixel in order to function.

54.     While seeking and using Defendant's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Defendant via its Website.

55.     Plaintiffs and Class Members were not aware that their Private Information would be shared with Facebook as it was communicated to Defendant because, among other reasons, Defendant did not disclose this fact.

56.     Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to Facebook, nor did they intend for Facebook to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

57.     The Pixel embedded on the Website and first party cookies sent non-public Private Information to Facebook, including but not limited to Plaintiffs' and Class Members': (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); and (6) searches for and selections of physicians and their specialties conducted via the general search bar.

58.     Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside the Plaintiffs' and Class Members' Facebook IDs (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identities.[16]

59.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographics and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's FID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the FID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

60.    Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (1) implemented technology (*i.e.*, the Facebook Pixel and first party cookies) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

**E.    Defendant's Pixel Disseminates Patient Information via Its Website**

61.    An example illustrates the point. If a patient used the Website to find a physician and book an appointment, Defendant's Website directed them to communicate Private Information, including the specialty of the physician, the physician's name, the date and time of the desired appointment, and the location of the appointment. Unbeknownst to the patient, every communication was sent to Facebook via Defendant's Pixel.

62.    Unbeknownst to ordinary patients, the "Find a Doctor" page and its included appointment section—which was used to communicate Private Information

---

[16] Defendant's Website tracked and transmitted data via first party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

1    for the purpose of seeking medical treatment—contained Defendant's Facebook Pixel.

2    The image below shows the "behind the scenes" portion of the website that is invisible

3    to ordinary users. Importantly, each entry in the column represents just one instance

4    in which Defendant's Facebook Pixel sent this user's information to Facebook.





*Figure 2. The image above is a screenshot taken from the Markup GitHub research for its article on Defendant's conduct (captured 4/27/2022)*

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

63.     Thus, without alerting the user, Defendant's Facebook Pixel sent each and every communication the user made via the webpage to Facebook, and the images below confirm that the communications Defendant sent to Facebook contained the user's Private Information.

64.     The first line of highlighted text, "id:737223089739564", refers to Defendant's Facebook Pixel ID and confirms that Defendant downloaded the Pixel into its source code on this webpage.

65.     On the same line of text, "ev= SuscribedButtonClick" identifies and categorizes which actions the user took on the webpage ("ev=" is an abbreviation for event, and "SubsrcibedButtonClick" is the type of event). Thus, this identifies the user as pressing the button labeled "Finish Booking."

66.     The additional lines of highlighted text show Defendant had disclosed to Facebook that the user: (1) was a patient seeking medical care from Defendant via scripps.org, even labeling the user as "new patient" to make it painstakingly clear; (2) the user sought treatment from physician Dr. Maria Murillo; (3) the physician is an OB-GYN; and (4) the user "Finish[ed] Booking" an appointment with the specific OB-GYN physician.

67.     Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's FID (c_user ID), thereby allowing the user's communications and actions on the Website to be linked to the user's specific Facebook profile.

68.     In the example above, the user's Website activity and the contents of the user's communications were sent to Facebook alongside their personally identifiable information using the c_user cookie that links to Facebook when the user is logged in. Several different methods allow marketers and third parties to identify individual website users other than the interaction between the c_user cookie and the Pixel.

69.     Facebook received at least six cookies when Defendant's Website transmitted information via the Pixel while the user was logged in, including the c_user cookie.

70.     When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies:[17]

| fr | 00Zp... | .facebook.com |
|----|---------|---------------|
| wd | 1156... | .facebook.com |
| sb | qqAz... | .facebook.com |
| datr | Malz... | .facebook.com |

*Figure 3. Screengrab from Defendant's Website depicting the cookies attached to a recently logged out Facebook user when they search Defendant's Website.*

71.     The fr cookie contains an encrypted FID and browser identifier.[18] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[19]

72.     The cookies referred to above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—*i.e.,* Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the way individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its Website.

---

[17] The screenshot below serves as example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the preceding image is the fbp cookie, which is transmitted as a first-party cookie.

[18] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf.

[19] *Cookies Policy*, Meta (effective June 16, 2023), https://mbasic.facebook.com/privacy/policies/cookies/printable/.

18

73.     Defendant also revealed its website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user.[20]

74.     Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookie and the c_user cookie, the _fbp cookie functions as a first-party cookie—*i.e.,* a cookie that was created and placed on the website by Defendant.[21]

75.     The Facebook Pixel uses both first- and third-party cookies.

76.     In summation, after intercepting and collecting this information, Facebook viewed it, processed it, analyzed it, and assimilated it into datasets by, at a minimum, using the fr, _fbp, and c_user cookies to link website visitors' communications and online activity with their corresponding Facebook profiles. Moreover, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

**F.     Defendant's Use of Google Analytics**

77.     Defendant also utilized Google Analytics tracking technology which Defendant did reveal within its *Privacy Policy* during its time using and implementing Google's tracking technology.[22]

78.     Defendant stated, "Scripps uses Google Analytics, a web analytics service by Google Inc." and additionally claimed, "We do not use Google Analytics to gather information that personally identifies you."[23] However, the Google Analytics version that was in operation during Defendant's implementation could log and store

---

[20] *Id.*

[21] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

[22] *Supra* fn. 14.

[23] *Id.*

IP address information, which is personally identifying information and impermissible under HIPAA.[24]

79.     Additionally, Google Analytics services could be accompanied by a session ID cookie that connects with a user's Google account and personally identifies a patient based on the personal information contained in the patient's Google account such as name, email address, address, and phone number.

80.     The HHS bulletin states:

> Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the **Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures.** Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.[25]

81.     Accordingly, Defendant's statements do not exculpate its impermissible use of tracking technology. Defendant's statements regarding its use of Google Analytics do not reveal the scope of Private Information that is transmitted to Google and how Private Information is used for advertising and marketing data packages.

82.     Defendant has removed tracking technology from the Website and changed its privacy policy, so Plaintiffs are not currently able to discover the scope of Defendant's data sharing practices. Discovery is necessary to determine whether Defendant's use of Google Analytics resulted in impermissible disclosures.

83.     Defendant did not disclose that the Pixel, first-party cookies, Google

---

[24] In March of 2022, Google announced that it would no longer use IP addresses, phase out previous Analytics software by 2023 and replace all Google analytics technology with GA4 that comes equipped with Privacy features. *See* Kendra Clark, *Google Analytics stops logging IP addresses: here's why it's a big deal for marketers*, The Drum (March 16, 2022), https://www.thedrum.com/news/2022/03/16/google-analytics-nixes-ip-address-logging-new-privacy-play.

[25] *Supra* fn. 3 (emphasis added).

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

Analytics, or any other Tracking Tools embedded in the Website's Source Code tracked, recorded, and transmitted Plaintiffs' and Class Members' Private Information to Facebook and Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiffs' and Class Members' private communications to Facebook or Google.

### G.   Plaintiffs' Experiences

*Plaintiff John Doe 1's Experience*

84.   Plaintiff John Doe 1 has been a patient of Scripps Health since 2015 and has received healthcare services at hospitals and clinics in Defendant's network.

85.   On numerous occasions since 2015, and prior to June of 2022, Plaintiff accessed Defendant's Website on his computer and/or mobile device for the purpose of finding and obtaining medical treatment for his lumbar fusion and neurological issues during the Defendant's operation of tracking technology. Plaintiff accessed Defendant's Website to receive healthcare services from Defendant or Defendant's affiliates, at Defendant's direction, and with Defendant's encouragement.

86.   Plaintiff John Doe 1 used Defendant's Website to search for particular medical physicians that specialize in treating lumbar fusion and neurological ailments, and to send inquiries about healthcare services for his lumbar fusion and neurological issues via the Defendant's Website.

87.   Plaintiff John Doe 1 has been a Facebook user since at least 2004.

88.   As Defendant's patient, Plaintiff John Doe 1 reasonably expected that his online communications with Defendant were solely between himself and Defendant and that such communications would not be transmitted to or disclosed to a third party. But for his status as Defendant's patient, Plaintiff would not have disclosed his Private Information to Defendant.

89.    Plaintiff John Doe 1 provided his Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

21

90.    During his time as a patient, Plaintiff John Doe 1 never consented to the use of his Private Information by third parties or to Defendant enabling third parties, including Facebook, to access or interpret such information.

91.    Plaintiff John Doe 1 had a specific medical procedure performed to treat his lumbar fusion and resulting neurological issues and submitted information to Defendant's Website about this procedure and to specialists who could perform this procedure, along with other healthcare related items, which Defendant simultaneously sent to Facebook.

92.    Defendant transmitted to Facebook Plaintiff John Doe 1's personal information and protected health information including but not limited to his email address; phone number; computer or device IP address; appointment information; information entered into Defendant's Website; button/menu selections, and/or content typed into free text boxes; and sensitive medical information such as physicians selected, details about his searches for physicians and specialists, details about his searches for medical services; and other protected health information.

93.    Pursuant to the systematic process described in this Complaint, Plaintiff John Doe 1's Private Information was disclosed to Facebook and Google, and this data included his PII, PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff John Doe 1's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff John Doe 1's Private Information.

94.    Facebook has viewed, processed, analyzed, and assimilated into datasets Plaintiff John Doe 1's Private Information transmitted to it by Defendant because Plaintiff has received targeted ads regarding his specific medical conditions in his Facebook feed after using Defendant's website for health services. Specifically, immediately after Plaintiff John Doe 1 used Defendant's Website to search for specialists and physicians that would be able to treat his lumbar fusion and

neurological issues, and to obtain related medical services, he started receiving advertisements on his Facebook feed pertaining to lumbar fusion and neurological ailments. These advertisements included advertisements for different pieces of hardware used to treat lumbar fusion issues, and various medicines commonly used to treat lumbar fusion and neurological issues.

95.     In sum, the Pixel embedded on Defendant's Website transmitted Plaintiff John Doe 1's highly sensitive communications and Private Information to Facebook, including communications that contained Private and confidential information, without Plaintiff John Doe 1's knowledge, consent, or express written authorization, which Facebook then viewed, processed, analyzed, and assimilated into datasets to target Plaintiff John Doe 1 with targeted ads for his specific medical condition.

96.     Defendant breached Plaintiff John Doe 1's right to privacy and unlawfully disclosed his Private Information to Facebook. Specifically, Plaintiff John Doe 1 had a reasonable expectation of privacy, based on his status as Defendant's patient, that Defendant would not disclose his Private Information to third parties.

97.     Defendant did not inform Plaintiff John Doe 1 that it shared his Private Information with Facebook.

98.     By doing so without Plaintiff John Doe 1's consent, Defendant breached Plaintiff John Doe 1's and Class Members' right to privacy and unlawfully disclosed Plaintiff John Doe 1's Private Information.

99.     Upon information and belief, as a "redundant" measure to ensure Plaintiff John Doe 1's and Class Members' Private Information was successfully transmitted to third parties like Facebook, Defendant implemented server-based workarounds to send Plaintiff John Doe 1's and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook.

100.   Plaintiff suffered injuries in the form of: (i) invasion of privacy; (ii) loss of the benefit of the bargain; (iii) diminution of value of his Private Information; (iv) statutory damages; and (v) the continued and ongoing risk of harassment, spam, and

targeted advertisements specific to Plaintiff John Doe 1's lumbar fusion and neurological conditions and other confidential information he communicated to Defendant via the Website.

### Plaintiff John Doe 2's Experience

101.   Since the 1980s, Plaintiff John Doe 2 received and utilized healthcare services offered by Defendant.

102.   Plaintiff John Doe 2 entrusted his Private Information to Defendant. As a condition of receiving Defendant's services, Plaintiff John Doe 2 disclosed his Private Information to Defendant.

103.   On numerous occasions prior to June of 2022 and continuing to the present, Plaintiff John Doe 2 accessed Defendant's Website to receive healthcare services from Defendant and at Defendant's direction.

104.   Plaintiff John Doe 2 inquired about healthcare services; researched symptoms, conditions, and treatments; communicated with healthcare professionals; utilized the Website's chat function; took health classes; watched instructional videos; reviewed medical billings and records; and searched for physicians and specialists for ailments he suffered from via Defendant's Website.

105.   Plaintiff John Doe 2 became a Facebook user in 2004.

106.   Plaintiff John Doe 2 reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

107.   Plaintiff John Doe 2 provided his Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

108.   As described herein, Defendant worked to assist Facebook with intercepting Plaintiff John Doe 2's communications, including those that contained Private and confidential information. Defendant willfully facilitated these

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

interceptions without Plaintiff John Doe 2's knowledge, consent, or express written authorization.

109.   Defendant transmitted to Facebook Plaintiff John Doe 2's Personal Information, including but not limited to his email address; phone number; computer or device IP address; information entered into Defendant's Website; button/menu selections, and/or content typed into free text boxes; and protected health information such as, but not limited to, appointment dates, details about his specific ailments, and details about the health classes Plaintiff John Doe 2 attended.

110.   By doing so without Plaintiff John Doe 2's consent, Defendant breached Plaintiff John Doe 2's right to privacy and unlawfully disclosed Plaintiff John Doe 2's Private Information.

111.   Defendant did not inform Plaintiff John Doe 2 that it shared his Private Information with Facebook. Plaintiff John Doe 2 discovered on his own that Defendant shared his Private Information with Facebook in or around July 2023.

112.   Plaintiff John Doe 2 had specific medical ailments including: Crohn's disease, atherosclerosis, heart valve surgery, and peripheral neuropathy. Further, Plaintiff John Doe 2 treated with a Primary Care Physician, Cardiologist, Dermatologist, Gastroenterologist, Physician's Assistants, Nurse Practitioners and Nurses. Plaintiff John Doe 2 submitted information to Defendant's Website, and searched for information on Defendant's Website, about the above-described ailments, along with other healthcare related items, which Defendant simultaneously submitted to Facebook.

113.   Plaintiff John Doe 2 observed ads on YouTube while watching videos that appeared related to his prior searches on and his use of Defendant's Website.

### *Plaintiff Catherine Gorey's Experience*

114.   Plaintiff Gorey has used www.scripps.org since at least 2022, accessing the Website from both her mobile phone and computer. Plaintiff Gorey used www.scripps.org to access the Scripps Website for various uses, including booking

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

appointments, viewing the results of medical tests, paying bills related to medical treatment, communicating with doctors, and completing pre-visit screening documents. As described herein, each time Plaintiff Gorey used the Scripps Website, she disclosed medical information regarding her medical condition, history, or treatment.

115.   On numerous occasions since at least 2022 and continuing to the present, Plaintiff Gorey accessed Defendant's Website to receive these healthcare services from Defendant and at Defendant's direction.

116.   Plaintiff Gorey has an active Facebook account which she has maintained since at least the time in controversy. Plaintiff Gorey accesses her Facebook account from multiple devices, including her smartphone.

117.   Plaintiff Gorey reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

118.   Plaintiff Gorey provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

119.   Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff Gorey's communications, including those which contained personally identifiable information, protected health information, and related confidential information. Defendant assisted these interceptions without Plaintiff Gorey's knowledge, consent, or express written authorization.

120.   Defendant transmitted to Facebook Plaintiff Gorey's Personal Information, including but not limited to her email address; phone number; computer or device IP address; information entered into Defendant's Website; button/menu selections, and/or content typed into free text boxes; and protected health information such as, but not limited to, appointment details and details about her specific ailments.

26

121.   By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Gorey's personally identifiable information and protected health information.

122.   Defendant did not inform Plaintiff Gorey that it shared her Private Information with Facebook. Plaintiff Gorey discovered on her own that Defendant shared her Private Information with Facebook in or around July 2023.

**H.     Defendant's Conduct Is Unlawful and Violated Industry Norms**

*Defendant Violated HIPAA Standards*

123.   Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[26]

124.   The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[27]

125.   The Privacy Rule broadly defines PHI as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

126.   IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to

---

[26] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 164.508(a)(3), 164.514(b)(2)(i).
[27] *HIPAA For Professionals*, U.S. Dept. of Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/index.html.

the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

127.   Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> A. Names;
>
> ***
>
> H. Medical record numbers;
>
> ***
>
> J.  Account numbers;
>
> ***
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> ***
>
> R. Any other unique identifying number, characteristic, or code…; and
>
> (ii) The covered entity does not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information.

45 C.F.R. § 160.514(b)(2).

28

128.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

129.   An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person . . . shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

130.   The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

131.   Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

132.   In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS, Office for Civil Rights (OCR) instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as

PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. . . . If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[28]

133.  In its guidance for Marketing, OCR further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.* (Emphasis added).[29]

134.  As alleged above, the HHS Bulletin highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[30]

135.  The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

---

[28]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredent ities/De-identification/hhs_deid_guidance.pdf (last visited October 31, 2023).

[29] *Marketing*, OCR HIPPA Privacy (created December 3, 2002, revised April 3, 2002), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentiti es/marketing.pdf.

[30]  *See*  https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

136.   The Bulletin also provides that the use of tracking technologies even on unauthenticated webpages may violate the HIPAA Rules if those webpages have access to PHI.[31]

137.   Defendant's actions violated the HIPAA Rules. While there is no private right of action under HIPAA and these violations do not constitute a cause of action in and of themselves, the violation of the HIPAA Rules provides context for the elements of Plaintiffs' and Class Members' underlying claims, including, *inter alia*: (1) the confidential nature of the information communicated to Defendant; (2) Plaintiffs' and Class Members' reasonable expectation of privacy in their confidential Private Information; (3) the highly offensive nature of Defendant's disclosure of Private Information; and (4) the fact that the Private Information communicated (including searches for specific symptoms, health conditions, or doctors, or the scheduling of appointments) constitutes the "contents" of the communication.

## I.   Defendant Violated the American Medical Association's Industry Standards

138.   A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

139.   The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

140.   AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care. . . . Patient privacy encompasses a number of aspects, including, . . . personal data (informational privacy) . . . . .[32]

141.   AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive

---

[31] *Id.*

[32] *See* https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care.

personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship.[33]

Physicians who propose to permit third-party access to specific patient information for commercial purposes should:

(a) Only provide data that has been de-identified [and]

(b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted.

142.   AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored.

Physicians who collect or store patient information electronically . . . must: . . . (c) Release patient information only in keeping ethics guidelines for confidentiality.[34]

## J.   Plaintiffs' and Class Members' Expectation of Privacy

143.   Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

144.   Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

145.   Plaintiffs and Class Members would not have used Defendant's Website,

---

[33]   *See*   https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies.
[34]   *See*   https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

**K.    IP Addresses are PII**

146.    On information and belief, using the Tracking Tools on Defendant's Website, Defendant also disclosed and otherwise assisted third parties with intercepting Plaintiffs' and Class Members' Computer IP addresses.

147.    An IP address is a number that identifies the address of a device connected to the Internet.

148.    IP addresses are used to identify and route communications on the Internet.

149.    IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

150.    Facebook tracks every IP address ever associated with a Facebook user.

151.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

152.    Under HIPAA, an IP address is considered PII:

- HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

153.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

33

**L.    Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures**

154.    The primary motivation for, and a determining factor in Defendant's interception and disclosure of Plaintiffs' and Class Members' Private Information, was to use patient data for advertising purposes in the absence of express written consent, which are criminal and tortious acts in violation of federal and state laws as alleged herein. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant was compensated by Facebook and others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

155.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

156.    Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Plaintiffs were personally retargeted with ads related to their medical conditions. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

157.    By utilizing the Pixel, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and state law.

**M.    Plaintiffs' and Class Members' Private Information Had Financial Value**

158.    Plaintiffs' data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

159.   Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil."[35] Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data.[36] That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.[37]

160.   The value of health data is well-known and has been reported upon extensively in the media. For example, Time Magazine published an article in 2017 titled, "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[38]

161.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[39]

## TOLLING

162.   Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their Private

---

[35] *See* Joris Toonders Yonego, *Data is the New Oil of the Digital Economy*, Wired https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/.

[36] *See* Robert Shapiro, *What Your Data Is Really Worth to Facebook*, Washington Monthly (July 12, 2019) https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/#:~:text=In%20the%20end%2C%20we%20calculated,detailed%20data%20that%20companies%20collect.

[37] *Id*.

[38] *See* Adam Turner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry,* Time (January 9, 2017), https://time.com/4588104/medical-data-industry/.

[39] *See* Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC (December 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

Information was intercepted and unlawfully disclosed to Facebook because Defendant kept this information secret.

## **CLASS ACTION ALLEGATIONS**

163. Class Definition: Pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other similarly situated individuals (the "Class"), defined as:

> Any and all California citizens who, during the Class Period, used Defendant's Website and were patients of Defendant.

164. The "Class Period" is defined as the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

165. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

166. <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

167. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used Defendant's Website and had their personally identifiable information and protected health information disclosed to third parties such as Facebook and Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

168.   <u>Adequacy</u>. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

169.   <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

 (a) Whether Defendant intentionally tapped the lines of internet communication between patients and their medical providers;

 (b) Whether Defendant's Website surreptitiously tracked personally identifiable information, protected health information, and related communications and simultaneously disclosed that information to Facebook and/or other third parties;

 (c) Whether Facebook and others are third-party eavesdroppers;

 (d) Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constitute an affirmative act of communication;

 (e) Whether Defendant's conduct, which allowed Facebook and others to view Plaintiffs' and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

 (f) Whether Defendant violated Plaintiffs' and Class Members'

37

privacy rights by using Facebook's Pixel to communicate online patients' Private Information and FIDs to Facebook;

(g)  Whether Plaintiffs and Class Members are entitled to damages under the CMIA;

(h)  Whether Plaintiffs and Class Members are entitled to damages under the CIPA or any other relevant statute;

(i)  Whether Defendant's actions violated Plaintiffs' and Class Members' privacy rights as provided by the California Constitution;

(j)  Whether Defendant breached a duty to safeguard Plaintiffs' and Class Members' sensitive personal and health information.

170.  <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act ("CIPA"),**
**Cal. Penal Code § 630, *et seq.***

171.  Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth therein and bring this count individually and on behalf of the proposed Class.

172.   The California Invasion of Privacy Act ("CIPA") begins with its statement of purpose.

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

173.   CIPA prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

174.   California Penal Code § 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

175.   Under CIPA, a defendant must show it had the consent of <u>all</u> parties to a communication.

176.   Violations of CIPA are not limited to phone lines, but also apply to "new

39

technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, No. 15-cv-04062, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, No. C06-05289, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history). Indeed, the Facebook Pixel was recently examined by the Northern District of California with the district court concluding that the plaintiffs were likely to succeed on the merits with respect to both CIPA and the analogous Federal Wiretap Act. *See In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *11, 13 (N.D. Cal. Dec. 22, 2022).

177.   CIPA affords a private right of action to any person who has been subjected to a violation of the statute to seek injunctive relief and statutory damages of $5,000 per violation, regardless of whether they suffered actual damages. Cal. Penal Code § 637.2.

178.   At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook to track and intercept Plaintiffs' and Class Members' internet communications while accessing Defendant's Website. These communications were transmitted to and intercepted by a third party during the communication and without the knowledge, authorization, or consent of Plaintiffs and Class Members.

179.   Defendant intentionally inserted an electronic listening device onto Plaintiffs' and Class Members' web browsers that, without the knowledge and consent of Plaintiffs and Class Members, tracked and transmitted the substance of their confidential communications with Defendant to a third party. Indeed, the Office for Civil Rights at the U.S. Department of Health and Human Services acknowledges in their letter to Defendant that Defendant's "use of online tracking technologies" on its

"website or mobile application" is "impermissibly disclosing consumers' sensitive personal health information to third parties."[40]

180.   Defendant willingly facilitated Facebook's interception and collection of Plaintiffs' and Class Members' private medical information by embedding the Facebook Pixel on its Website. Moreover, unlike past Facebook business tools such as the Facebook Like Button and older web beacons, Defendant has full control over the Pixel, including which webpages contain the Pixel, what information is tracked and transmitted via the Pixel, and how events are categorized prior to their transmission.

181.   Defendant's Pixel and tracking tools constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, these tools fall under the broad catch-all category of "any other manner."

182.   Defendant failed to disclose its use of the Facebook Pixel, Google Analytics, or other tracking technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Class Members' private communications with Defendant to undisclosed third parties.

183.   The Private Information that Defendant transmitted via the Facebook Pixel, such as searching a particular medical specialty, finding a physician in that specialty, booking an appointment with that physician, utilizing the chat function to speak with healthcare professionals, searching particular health conditions, and reviewing medical bills and records, all constitute information about Plaintiffs' and Class Members' past, present, or future health or health care and therefore constitute protected health information.

184.   The Pixel is designed such that it transmits each of the users' actions taken on the Website to a third party alongside and contemporaneously with the user initiating the communication. Thus, the communication is intercepted in transit to the

---

[40] *See* **Exhibit A**.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

intended recipient, Defendant, and before it reaches Defendant's server.

185.  As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to intercept and receive its patients' online communications in real time through its Website. Such interception occurred without Plaintiffs' and Class Members' consent, and Facebook, Google, and other third parties would not have received the contents of these communications but for Defendant's actions.

186.  By disclosing Plaintiffs' and Class Members' Private Information, Defendant violated Plaintiffs' and Class Members statutorily protected right to privacy.

187.  As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiffs and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

188.  Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

### SECOND CAUSE OF ACTION
### Violation of the California Confidentiality of
### Medical Information Act ("CMIA")
### Cal. Civ. Code § 56, *et seq.*

189.  Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein and bring this claim individually and on behalf of the proposed Class.

190.  Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), "A provider of health care . . . shall not disclose medical information

regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." § 56.10(a).[41] "An authorization for the release of medical information . . . shall be valid if it:

> (a) Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type.

> (b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

> (c) Is signed and dated . . .

> (d) States the specific uses and limitations on the types of medical information to be disclosed.

> (e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

> (f) States the name or functions of the persons or entities authorized to receive the medical information.

> (g) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

> (h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

> (i) Advises the person signing the authorization of the right to receive a copy of the authorization.

Cal. Civ. Code § 56.11.

---

[41] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place. For example, Defendant could bypass the authorization requirement if patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena. *See* Cal. Civ. Code §§ 56.10(b)(3) and 56.10(b)(6).

191.   The CMIA prohibits health care providers from disclosing medical information relating to their patients without a patient's authorization. Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding a patient's medical history, mental or physical condition, or treatment." 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual..." Cal. Civ. Code § 56.05.

192.   Defendant is a healthcare provider as defined by Cal. Civ. Code § 56.06.

193.   Plaintiffs and Class Members are patients of Defendant and, as health care providers, Defendant has an ongoing obligation to comply with the CMIA's requirements with respect to Plaintiffs' and Class Members' confidential medical information.

194.   As set forth above, names, addresses, telephone numbers, email addresses, device identifiers, web URLs, IP addresses, and other characteristics that can uniquely identify Plaintiffs and Class Members are transmitted to, and viewed by, Facebook and Google in combination with patient medical conditions, medical concerns, treatment(s) sought by the patients, medical appointments, medical specialty of the doctor(s) searched for by patients, prescription drug information and queries, and specific diagnoses and treatment plans available on Defendant's website. This protected health information and personally identifiable information constitutes confidential information under the CMIA.

195.   The FID is also an identifier that allows identification of a particular individual. Along with patients' confidential Private Information, Defendant discloses its patients' FIDs to Facebook.

196.   Pursuant to the CMIA, the information communicated to Defendant and disclosed to Facebook constitutes medical information because it is patient information derived from a health care provider regarding patients' medical treatment

44

and physical condition and is received by Facebook in combination with individually identifying information. Cal. Civ. Code § 56.05(i).

197.   As set forth above, Facebook views, processes, and analyzes the confidential medical information it receives via the Facebook Pixel, Conversions API, cookies, and other Facebook business tools. Facebook then uses the viewed confidential information to create Audiences for advertising and marketing purposes.

198.   Defendant failed to obtain Plaintiffs' and Class Members' authorization for the disclosure of medical information.

199.   Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and … executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or their representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. The information set forth on Defendant's Website, including the Website Privacy Policy and Notice of Privacy Practices, does not qualify as a valid authorization.

200.   Defendant violated the CMIA by disclosing its patients' medical information to Facebook along with the patients' individually identifying information.

201.   Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars, attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.

202.   Plaintiffs and Class Members seek nominal damages, compensatory damages, punitive damages, attorneys' fees, and costs of litigation for Defendant's violations of the CMIA.

### THIRD CAUSE OF ACTION
**Invasion of Privacy Under California's Constitution**

203.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein and bring this claim individually and on behalf of the proposed Class.

204.   Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites for the provision of health care without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

205.   At all relevant times, by using Facebook's Pixel to communicate patients' FIDs and other individually identifying information alongside their confidential medical communications, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

206.   Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that Defendant would not install wiretaps on its Website to secretly transmit their communications to a third party.

207.   Plaintiffs and Class Members did not authorize Defendant to transmit Plaintiffs' and Class Members' private medical communications alongside their personally identifiable health information to Facebook or to allow Facebook to intercept, receive, and view those communications.

208.   This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

209.   As a result of Defendant's actions, Plaintiffs and Class Members have

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

suffered harm and injury, including but not limited to an invasion of their privacy rights.

210. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

211. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests because of its intrusions upon Plaintiffs' and Class Members' privacy.

212. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant's from engaging in such conduct in the future.

213. Plaintiffs also seek such other relief as the Court may deem just and proper.

### **FOURTH CAUSE OF ACTION**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**

214. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein and bring this claim individually and on behalf of the proposed Class.

215. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services therein.

216. Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended only for Defendant to receive and that they understood Defendant would keep private.

217. Defendant's disclosure of the substance and nature of those

47

communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

218.   Defendant's conduct is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion because Defendant facilitated third parties' simultaneous eavesdropping and wiretapping of confidential communications.

219.   Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that Defendant would not install wiretaps on its Website to secretly transmit their communications to unauthorized third parties.

220.   Defendant was authorized to obtain Private Information from Plaintiffs' and Class Members' web browsers for itself but was not authorized to force Plaintiffs' and Class Members' web browsers to transmit information to Facebook, Google, and/or other third parties without their consent or authorization.

221.   Defendant therefore obtained Plaintiffs' and Class Members' Private Information under false pretenses and/or exceeded its authority to obtain the Private Information.

222.   As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

223.   Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

224.   Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests because of its intrusions upon Plaintiffs' and Class Members' privacy.

225.   Plaintiffs and Class Members are also entitled to punitive damages

resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant's from engaging in such conduct in the future.

226.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**
**Breach of Implied Contract**

227.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein and bring this claim individually and on behalf of the proposed Class.

228.    Plaintiffs and Class Members communicated their sensitive and protected Private Information to Defendant as part of their continuum of medical care provided by Defendant. Plaintiffs and Class Members did so on the reasonable expectation and mutual understanding that Defendant, as their healthcare provider, would maintain that information as confidential.

229.    Plaintiffs and Class Members entered into implied contracts with Defendant under which Defendant agreed to use their Private Information internally and not share it with third party marketing companies. Each such contractual relationship imposed on Defendant an implied covenant of good faith and fair dealing by which Defendant was required to perform its obligations and manage Plaintiffs' and Class Members' data in a manner that maintained its confidential nature.

230.    Plaintiffs and the Class Members would not have entrusted their sensitive and protected Private Information to Defendant in the absence of such an implied contract.

231.    Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing medical services to Plaintiffs and Class Members.

232.   Had Defendant disclosed to Plaintiffs and Class Members that Defendant would be sending their sensitive and protected Private Information to Facebook and Google, Plaintiffs and members of the Class would not have provided their information to Defendant.

233.   Defendant recognized that its patients' sensitive and protected medical information and individually identifiable information is highly sensitive and must not be shared with unauthorized third parties, and that this obligation was of material importance as part of the bargain to Plaintiffs and Class Members.

234.   Plaintiffs and the Class fully performed all their obligations under the implied contract with Defendant and provided Defendant with payment for medical care, directly or indirectly, and communicated their Private Information to Defendant in the course of their treatment.

235.   Defendant breached the implied contract with Plaintiffs and Class Members when it shared Plaintiffs' and Class Members' sensitive and protected Private Information with Facebook and Google and allowed these third parties to use the Private Information in a manner inconsistent with the conditions under which it was provided.

236.   Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

237.   Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## SIXTH CAUSE OF ACTION
**Violations of Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511(1), *et seq*.**
**Unauthorized Interception, Use, and Disclosure**

238.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein and bring this claim individually and on behalf of the proposed Class.

239.   The ECPA protects both sending and receipt of communications.

240.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

241.   The transmissions of Plaintiffs' Private Information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

242.   **Electronic Communications.** The transmission of Private Information between Plaintiffs and Class Members and Defendant's website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

243.   **Content.** The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

244.   **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

245.   **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5): Plaintiffs' and Class Members' browsers;

  a.  Plaintiffs' and Class Members' computing devices;

b. Defendant's webservers; and

c. The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

246. By utilizing and embedding the Pixel on its website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

247. Specifically, Defendant accepted Plaintiffs' and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' PII to Facebook. Indeed, by Defendant's action of embedding the Pixel on its website, which Defendant knew would track, store, and unlawfully transmit Plaintiffs' and Class Members' PII to Facebook, Defendant procured Facebook to intercept Plaintiffs' and Class Members' electronic communications. *See* 18 U.S.C. § 2511(1)(a).

248. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding Private Information, treatment, medication, and scheduling.

249. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

250. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

251. **Unauthorized Purpose.** Defendant intentionally intercepted, and

procured Facebook to intercept or endeavor to intercept, the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

252.   Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' Private Information for financial gain including but not limited to using the tracked Private Information to target Plaintiffs and Class Members with advertisements on Facebook and other third-party platforms for marketing and retargeting purposes.

253.   Defendant was not acting under color of law to intercept or procure Facebook or any other third-party platform to intercept or endeavor to intercept, Plaintiffs and the Class Member's wire or electronic communications.

254.   Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy by transmitting their Private Information via the Pixel to Facebook or any other third-party platforms.

255.   Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

256.   In transmitting, acquiring, and procuring Facebook to intercept or endeavor to intercept the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (1) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (2) violations of CIPA and CMIA.

**SEVENTH CAUSE OF ACTION**
**Violation of Title II of the Electronic Communications Privacy Act**
**Unauthorized Divulgence by Electronic Communications Service**
**18 U.S.C. § 2702, *et seq*.**
**Stored Communications Act**

257.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein and bring this claim individually and on behalf of the proposed Class.

258.   The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

259.   **Electronic Communication Service.** ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

260.   Defendant intentionally procures and embeds various Plaintiffs' Private Information through the Pixel used on Defendant's website, which qualifies as an Electronic Communication Service.

261.   **Electronic Storage.** ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

262.   Defendant stores the content of Plaintiffs' and Class Members' communications on Defendant's website and files associated with it.

263.   When Plaintiffs or Class Members make a website communication the content of that communication is immediately placed into storage and is transmitted to Facebook via the Pixel.

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

264.  Defendant knowingly divulges the contents of Plaintiffs' and Class Members' communications through the Pixel.

265.  **Exceptions Do Not Apply.** Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication—"

    a.  "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient."

    b.  "as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title;"

    c.  "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;"

    d.  "to a person employed or authorized or whose facilities are used to forward such communication to its destination;"

    e.  "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;"

    f.  "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A."

    g.  "to law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;"

    h.  "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency"; or

    i.  "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney

General has determined and certified to Congress satisfies Section 2523."

266.   Defendant did not divulge the contents of Plaintiffs' and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiffs and Class Members.

267.   Section 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

268.   Section 2511(2)(a)(i) provides:

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

269.   Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications on Defendant's website to Facebook was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (1) a necessary incident to the rendition of the Defendant's services; nor (2) necessary to the protection of the rights or property of Defendant.

270.   Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

271.   Defendant's divulgence of the contents of user communications on Defendant's website was not done "with the lawful consent of the originator or any addresses or intend recipient of such communication[s]." As alleged above: (a) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications; and (b) Defendant did not procure the "lawful consent" from

56

the websites or apps with which Plaintiffs and Class Members were exchanging information.

272.   Moreover, Defendant divulged the contents of Plaintiffs and Class Members' communications through the Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

273.   The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

274.   As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.   For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.   For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members:

D.   For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: May 22, 2024                    **BURSOR & FISHER, P.A**.

By: *  /s/ Brittany S. Scott*

L TIMOTHY FISHER (191626)
BRITTANY S. SCOTT (327132)
JOSHUA R. WILNER (353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
           bscott@bursor.com
           jwilner@bursor.com

SCOTT R. DRURY (*pro hac vice*)
**DRURY LEGAL, LLC**
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Tel: (619) 239-4599
Email: byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

M. ANDERSON BERRY (262879)
GREGORY HAROUTUNIAN (330263)

58

BRANDON P. JACK (325584)
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
6200 Canoga Avenue, Suite 375
Woodland Hills, CA 91367
Tel: (747) 777-7748
Fax: (916) 924-1829
Email : aberry@justice4you.com
gharoutunian@justice4you.com
bjack@justice4you.com

JOHN J. NELSON (317598)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Counsel for Plaintiffs and the*
*Proposed Class*

FIRST AMENDED CONSOLIDATED COMPLAINT                    CASE NO. 23-CV-2215-AGS-DEB

**EXHIBIT A**

 

July 20, 2023

Scripps Memorial Hospital La Jolla - Scripps Health
10140 Campus Point Dr., Cpa 415,
San Diego, CA 92121-1520
Attn:  Bradley S. Ellis, Senior VP & Chief Legal Officer

   Re:  Use of Online Tracking Technologies

Dear Mr. Ellis,

The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[1] news reports,[2] FTC enforcement actions,[3] and an OCR bulletin[4] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities.  These tracking technologies

---

[1] *See, e.g.,* Mingjia Huo, Maxwell Bland, and Kirill Levchenko, *All Eyes on Me:  Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, Proceedings of the 21st Workshop on Privacy in the Electronic Society (Nov. 7, 2022), https://dl.acm.org/doi/10.1145/3559613.3563190.

[2] *See, e.g.,* Todd Feathers, Katie Palmer, and Simon Fondrie-Teitler, *Out of Control: Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[3] *U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/cases-proceedings/192-3133-flo-health-inc.

[4] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users.

Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others.  Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more.  In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.

### Health Insurance Portability and Accountability Act of 1996 (HIPAA)

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium.

The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (*e.g.,* tracking technology vendors) includes PHI. HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules.  OCR's December 2022 bulletin about the use of online tracking technologies by HIPAA regulated entities provides a general overview of how the HIPAA Rules apply.[5]  This bulletin discusses what tracking technologies are and reminds regulated entities of their obligations to comply with the HIPAA Rules when using tracking technologies.

### FTC Act and FTC Health Breach Notification Rule

Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule.  This is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes.  As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app.[6]  The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[7]  Within the last

---

[5] *Id.*

[6] *See supra* note 3.

[7] *See* Federal Trade Comm'n, *Statement of the Commission on Breaches by Health Apps and Other Connected Devices* (Sept. 15, 2021),
https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

few months, the FTC has issued a series of guidance pieces addressed to entities collecting, using, or disclosing sensitive health information.[8]

OCR and the FTC remain committed to ensuring that consumers' health privacy remains protected with respect to this critical issue.  Both agencies are closely watching developments in this area.  To the extent you are using the tracking technologies described in this letter on your website or app, we strongly encourage you to review the laws cited in this letter and take actions to protect the privacy and security of individuals' health information.[9]

Sincerely,

(b)(6)

Melanie Fontes Rainer
Director
Office for Civil Rights
U.S. Department of Health and Human Services

(b)(6)

Samuel Levine
Director
Bureau of Consumer Protection
Federal Trade Commission

---

[8] *See, e.g.*, FTC Office of Technology, *Lurking Beneath the Surface:  Hidden Impacts of Pixel Tracking* (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking; Lesley Fair, *First FTC Health Breach Notification Rule case addresses GoodRx's not-so-good privacy practices* (Feb. 1, 2023), https://www.ftc.gov/business-guidance/blog/2023/02/first-ftc-health-breach-notification-rule-case-addresses-goodrxs-not-so-good-privacy-practices; Federal Trade Comm'n and the U.S. Department of Health & Human Services' Office of the National Coordinator for Health Information Technology (ONC), Office for Civil Rights (OCR), and Food and Drug Administration (FDA), *Mobile Health App Interactive Tool* (Dec. 2022), https://www.ftc.gov/business-guidance/resources/mobile-health-apps-interactive-tool; Kristin Cohen, *Location, health, and other sensitive information:  FTC Committed to fully enforcing the law against illegal use and sharing of highly sensitive data* (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal.

[9] In addition to the HIPAA Rules, the FTC Act, and the FTC Health Breach Notification Rule, you may also be subject to other state or federal statutes that prohibit the disclosure of personal health information.